IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>OWEN ZACHARY SIMONSON,<br><br>　　　　　Defendant. | Cr. No. 4:23-cr-40087<br><br>DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS |

COMES NOW, Defendant, Owen Zachary Simonson, by and through his attorney, Assistant Federal Public Defender Matthew M. Powers, and files this memorandum in support of Defendant's motion to dismiss.

Simonson acknowledges that the Eighth Circuit has recently ruled that 18 U.S.C. § 922(g)(1) is constitutional and not subject to either facial or "as applied" challenges. *See United States v. Jackson*, 69 F.4th 495, 501-506 (8th Cir. 2023). Reh'g en banc denied, 2023 U.S. App. LEXIS 22991 (8th Cir. 2023). Simonson presents these arguments to preserve them for further review, should the United States Supreme Court overturn the decision in *Jackson*.

## INTRODUCTION

The Supreme Court's recent opinion in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), upended Second Amendment doctrine. Before *Bruen*, courts decided Second Amendment challenges by balancing the strength of the government's interest in firearm regulation against the degree of infringement on the challenger's right to keep and bear arms. *Bruen* rejected that

approach, instructing courts, instead, to consider only "constitutional text and history." *Id*. at 2128-29. If "the Second Amendment's plain text covers an individual's conduct," then under *Bruen* "the Constitution presumptively protects that conduct." *Id*. at 2129-30. To rebut the presumption, the government must show that a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id*. The test for historical consistency is: a firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted in the founding era, when the Second Amendment was adopted.

Under the framework mandated by *Bruen*, the Court should dismiss the one-count indictment against Owen Simonson, which charges him with being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). Because possession of a firearm comes within the Second Amendment's "plain text," Mr. Simonson's alleged conduct is presumptively protected. And the government will be unable to rebut that presumption. Felon-disarmament laws, which did not appear in the United States until the 20th century, were unknown to the generation that ratified the Second Amendment. The indictment must be dismissed.

## LEGAL BACKGROUND

The Second Amendment provides, "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment to the United States Constitution "confer[s] an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). This right "shall not be infringed."

2

U.S. Const. amend. II. The right to keep and bear arms is fundamental, applicable against state and local governments, and entitled to the same protections as other fundamental rights enshrined in the Constitution. *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010).

In *Bruen*, the Court announced its new standard for determining the constitutionality of firearms regulation under the Second Amendment. The *Bruen* court directly rejected consideration of "means-end," or policy-based, test. *Bruen*, 142 S. Ct. at 2128-29. The Court explained the correct, and only, two prongs of the analysis are:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2129-30 (citation omitted). Therefore, courts cannot consider whether prohibiting the possession of firearms is a worthwhile policy goal. Instead, they must only consider whether the restricted conduct falls within the plain text of the Second Amendment, and then if the challenged regulation barring that conduct is consistent with the nation's history of arms regulation.

## ARGUMENT

**A. The Second Amendment's plain text covers conduct at issue in § 922(g)(1).**

In *Bruen's* opening sentence, the Court reiterated that the Second and Fourteenth Amendments protect the right "to possess a handgun in the home for

3

self-defense." *Id.* at 2122 (emphasis added). Further, these Amendments "protect an individual's right to carry a handgun for self-defense outside the home." *Id. Bruen* acknowledged "that the right to 'bear arms' refers to the right to 'wear, bear, or carry…upon the person or in the clothing or in a pocket, for the purpose…of being armed and ready for offensive or defensive action in a case of conflict of another.'" *Id.* at 2134. (quoting *Muscarello v. U.S.*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)).

A person's[1] ability to possess a firearm for self-defense is the central component of the Second Amendment right. Section 922(g)(1) creates a complete bar

---

1 In post-*Bruen* cases, the United States has argued that people who do not follow the law are not "people" for purposes of the plain text of the Second Amendment. This argument is without merit and is entirely inconsistent with the *Heller* and *Bruen* decisions.

> Further, the Government's proffered interpretation of "law-abiding" admits to no true limiting principle. Under the Government's reading, Congress could remove "unordinary" or "irresponsible" or "non-law-abiding" people—however expediently defined—from the scope of the Second Amendment. Could speeders be stripped of their right to keep and bear arms? Political nonconformists? People who do not recycle or drive an electric vehicle? One easily gets the point: Neither *Heller* nor *Bruen* countenances such a malleable scope of the Second Amendment's protections; to the contrary, the Supreme Court has made clear that "the Second Amendment right is exercised individually and belongs to all Americans," *Heller*, 554 U.S. at 581, 128 S.Ct. 2783. *Rahimi*, while hardly a model citizen, is nonetheless among "the people" entitled to the Second Amendment's guarantees, all other things equal.

*United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023), *cert. granted*, No. 22-915, 2023 WL 4278450 (U.S. June 30, 2023).

As one court noted, the argument that "lawbreakers" aren't part of "the people" whose rights are protected by the Constitution is a slippery slope:

on firearm possession, whether in the home or in public. Thus, the conduct at issue is clearly protected by the plain text of the Second Amendment, satisfying the first prong of *Bruen* analysis. *Bruen*, 142 S. Ct. at 2126 (". . . [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.").

The Defendant is part of "the people" within the meaning of the Second Amendment. Just as that amendment does not "draw a home/public distinction with respect to the right to keep and bear arms," *Id*. at 2134, it does not draw a felon/non-felon distinction. "Nothing in the Second Amendment's text" suggests individuals convicted of a felony are unentitled to the amendment's protection. *Id*.

**B. The Government cannot meet its burden to show that § 922(g)(1)'s restrictions are "consistent with the Nation's historical tradition of firearm regulation."**

The second prong of the *Bruen* test places the burden on the government to demonstrate that the regulation is consistent with the nation's historical tradition

---

> Frankly, it's not even clear this is carving out a "subset," as much as an outright declaration of the federal government's belief that it can deprive practically anyone of their Second Amendment right. Who among us, after all, isn't a "lawbreaker"? For sure, there may well exist some adult who has never exceeded the speed limit, changed lanes without signaling, or failed to come to a complete stop at a stop sign, but they are few and far between.

*United States v. Harrison*, No. CR-22-00328-PRW, --- F.Supp.3d ----, 2023 WL 1771138, at *4, n. 21 (W.D. Okla. Feb. 3, 2023). Moreover, classifying groups as not "people" is the road to atrocity by dehumanization. That type of thinking underlies historical justifications for "legal" mistreatment of slaves, Native Americans, or religious minorities in our nation and world history.

of firearm regulation. Courts must "consider whether 'historical precedent' . . . evinces a comparable tradition of regulation." *Bruen*, 142 S. Ct. at 2131-32. If "no such tradition" exists, then the challenged statute is unconstitutional. *Id.* at 2132. Moreover, even if there are "multiple plausible interpretations" of an ambiguous history, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141, n. 11; *see also* at 2139. Notably, the Government bears the burden or "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

To meet its burden, the Government must point to "historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation." *Id.* at 2131–32 (internal quotation marks omitted). However, historical precedents from the mid- to late-19th-century to the present are of little value, unless they confirm what the law had already established. *Id.* at 2137. Further, "[Courts] are not obliged to sift the historical materials for evidence to sustain [§ 922(g)(1)]. That is [the Government's] burden." *Id.* at 2150.

The Eighth Circuit has ruled on the constitutionality of 18 U.S.C. § 922(g)(1) in the wake of *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742, 790, without applying "means-ends" scrutiny, but deciding matters in a summary fashion. *See e.g. United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011). Notably, the *Joos* case specifically rejects the defendant's Second Amendment challenge to 922(g) on the basis of the Eighth Circuit's decision

6

in *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010). *Joos*, 638 F.3d at 586. However, the *Seay* court's analysis is not based on the proper "historical" context; it considers the "historical" period from the Gun Control Act of 1968, which is too recent to be considered under *Bruen's* analysis. As noted in *Bruen*, historical precedents from the mid- to late-19th-century to the present are of little value, unless they confirm what the law had already established. *Bruen*, 142 S. Ct. at 2137. The Eighth Circuit's reliance on modern gun control regulation is evident:

> Further, § 922(g)(3) has the same historical pedigree as other portions of § 922(g) which are repeatedly upheld by numerous courts since *Heller*. See Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213. Moreover, in passing § 922(g)(3), Congress expressed its intention to "keep firearms out of the possession of drug abusers, a dangerous class of individuals." . . . As such, we find that § 922(g)(3) is the type of "longstanding prohibition [ ] on the possession of firearms" that *Heller* declared presumptively lawful. *See* 128 S.Ct. at 2816-17.

*Seay*, 620 F.3d at 925.

Simply put, the Eighth Circuit's "historical" analysis in *Seay* does not consider the correct time frame under *Bruen*. *Joos*, in turn, is incorrect in its analysis as it is based on *Seay*. The "historical pedigree" considered is too recent.

Similar error is found in *United States v. Bena*, 664 F.3d 1180 (8th Cir. 2011). The decision in *Bena* relies on the Fifth Circuit's analysis of the constitutionality of 18 U.S.C. § 922(g)(8) in *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001). However, the Fifth Circuit has recognized that *Emerson* is no longer good law under *Bruen*. *See United States v. Rahimi*, 61 F.4th 443, 450-451 (5th Cir. 2023). Further, *Rahimi*, applying Bruen's standards, found 922(g)(8) unconstitutional – essentially destroying *Bena's*, analytical foundation and illustrating the need to reexamine the

7

various 922(g) cases in light of *Bruen*. The previous analyses either relied on improper "means-ends" analysis, as in *Bena's* reliance on *Emerson*, or considered the incorrect historical timeframe, as in *Seay*.

Therefore, pre-*Bruen* authorities shed little light on the legality of firearms regulations post-*Bruen*. As suggested by the Fifth Circuit, these past decisions are now obsolete:

> In the course of its explication, the [*Bruen*] Court expressly repudiated the circuit courts' means-end scrutiny—the second step embodied in *Emerson* and applied in *McGinnis*. … To the extent that the Court did not overtly overrule *Emerson* and *McGinnis*—it did not cite those cases but discussed other circuits' similar precedent—*Bruen* clearly "fundamentally change[d]" our analysis of laws that implicate the Second Amendment, rendering our prior precedent obsolete.

*Rahimi*, 61 F.4th at 450–51 (emphasis added, citations omitted). Prior analysis no longer remains good law. *Id.*

**1. The "distinctly similar" standard applies here because possession of firearms by felons is a long-standing general societal problem.**

Disarmament laws that address long-standing social problems require evidence that similar regulations existed at the time of ratification. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen* at 2131. This language identifies the stringent "distinctly similar" standard of comparison for gun regulations aimed at long-

8

standing societal ills[2]. Further, "[I]f earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id*.

The problem addressed by § 922(g)(1) is longstanding; concerns of felons' access to guns "has persisted since [at least] the 18th century." *Id*. at 2131. The government must meet the "distinctly similar" standard to show a comparable historical regulation of comparably similar means, or else § 922(g)(1) runs afoul of the rights guaranteed by the Second Amendment. The government will be unable to do so.

### 2. The government cannot meet its burden to show a "distinctly similar" historical regulation that completely bars felons from possessing firearms.

What is today § 922(g)(1) traces its origins to 1938, when Congress passed a statute, the Federal Firearms Act, prohibiting certain felons from receiving firearms. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing c. 850, § 2(f), 52 Stat. 1250, 1251 (1938)). At that time, the statute "covered only a few violent offenses," *id*., prohibiting receipt of a firearm by those convicted of crimes such as murder, rape, kidnapping, and burglary. *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011). It was not until 1961 that congress amended the statute to cover receipt by "all felons." *Skoien*, 614 F.3d at 640 (emphasis in

---

[2] This is contrasted with the lower level "relevantly similar" standard also presented in *Bruen*. When the modern statute reflects "unprecedented social concerns or dramatic technological changes," the government need only show "relevantly similar" historical analogues. *Bruen* at 2131 and 2132.

9

original) (citing Pub. L. 87–342, 75 Stat. 757). Seven years later, "Congress changed the 'receipt' element of the 1938 law to 'possession,' giving 18 U.S.C. § 922(g)(1) its current form." *Id*.

Thus, § 922(g)(1) "is firmly rooted in the twentieth century," *Booker*, 644 F.3d at 24—a century and a half after adoption of the Second Amendment. The Court in *Bruen* said it would not even "address any of the 20th-century historical evidence brought to bear by respondents or their amici," since evidence of that type "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id*. at 2154 n.28. Regulations of such recent vintage cannot establish a historical tradition unless they "confirm[]" earlier practice. *Bruen*, 142 S. Ct. at 2137.

Here, they do not. Even if the Court broadens its focus to consider state statutes, § 922(g)(1) "bears little resemblance to laws in effect at the time the Second Amendment was ratified." *N.R.A. v. A.T.F.*, 700 F.3d 185, 196 (5th Cir. 2012). In 2007, Robert H. Churchill, a history professor at the University of Hartford, undertook "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 143 & n.11 (2007). Based on that survey, Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members

10

of the body politic." *Id.* at 142. Carlton Larson, a professor at the University of California-Davis School of Law, has written that, "[a]s far as [he] can determine, state laws prohibiting felons from possessing firearms or denying firearms licenses to felons date from the early part of the twentieth century." Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009).

Other scholars agree. Although it is difficult "to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009). It appears New York became the first state to enact such a ban, when in 1917 it made a felony conviction a basis for revoking a concealed-weapon permit. *Id.* No other state passed a felon-disarmament law until 1923. *Id.*; see also Adam Winkler, Heller's *Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (noting "the absence of historical support for the claim that [felon-disarmament laws] are consistent with the preexisting right to arms"); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187, 1211 (2015) ("[P]rohibitions on the possession of firearms by convicted felons emerged early in the twentieth century in response to a crime wave following the First World War.").

In short, there was no "historical tradition," circa 1791, of gun regulations "distinctly similar" to § 922(g)(1). *Bruen*, 142 S. Ct. at 2130-31. The "Founders themselves could have adopted" laws like § 922(g)(1) to "confront" the "perceived societal problem" posed by felons' access to guns. *Id.* at 2131. But they declined to do so, and that inaction indicates § 922(g)(1) "[i]s unconstitutional." *Id.*[3]

### 3. The history of this country required felons to possess firearms at the time of the Founding, in some circumstances. Disarmament of felons contradicts our nation's historical traditions.

*Heller* concluded "the Second Amendment's prefatory clause"—i.e., "A well regulated Militia, being necessary to the security of a free State"—"announces the purpose for which the right was codified: to prevent elimination of the militia." 554 U.S. at 599. Given that "stated purpose, logic demands that if an individual was (or is) a member of the 'militia,' the Second Amendment's protections extend at least to those who constitute the militia." *Firearms Pol'y Coal., Inc. v. McCraw*, 2022 WL

---

[3] Recent decisions in this District have determined that "*Bruen* is not irreconcilable with previous Eighth Circuit decisions and the district court in this case is still bound by Eighth Circuit precedent to uphold the constitutionality of 18 U.S.C. § 922(g)(1)." *United States v. Hoeft*, No. 4:21-CR-40163-KES, 2023 WL 2586030, at *3 (D.S.D. Mar. 21, 2023). However, the *Hoeft* decision does not engage in a historical analysis of that statute, instead analogizing to the Supreme Court's apparent support for background checks. *Id*. The *Hoeft* court's analogy is improper because the screening measures to which it refers are too modern to justify a historical tradition. Moreover, *Bruen* did not engage in an analysis of 922(g)(1), which analysis is now necessary under the newly announced standard. Further, the Eighth Circuit's decision in *United States v. Bena,* 664 F.3d 1180 (8th Cir. 2011), cited by the *Hoeft* court, applies a "government interest" test to its analysis. *Id.* at 1184. Thus, it is incompatible with *Bruen*. In addition, *Bena* recognizes, "[t]he first federal felon-in-possession law was not enacted until 1938." *Id.* at 1182. Therefore, Eighth Circuit precedents establish that the federal regulation of felons from possessing firearms is not "longstanding" under the *Bruen* standard.

12

3656996, at *5 (N.D. Tex. Aug. 25, 2022). "That is, although the Second Amendment is not limited to only those in the militia, it must protect at least the pool of individuals from whom the militia would be drawn." *Id*. As of 1791, that pool included felons.

*Heller* defined the militia as "all males physically capable of acting in concert for the common defense," 554 U.S. at 595, and statutory law from the founding era demonstrates that "all males" encompassed felons. In the first Militia Act, enacted one year after the Second Amendment's ratification, Congress provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years . . . shall severally and respectively be enrolled in the militia." Act of May 8, 1792, § 1, 1 Stat. 271 (Ex. A). The Act further stipulated that "every citizen so enrolled . . . shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt," and various other firearm accoutrements, including ammunition. *Id*. Although the Act "exempted" certain classes of people from these requirements (e.g., "all custom-house officers," "all ferrymen employed at any ferry on the post road"), felons were not among them. *Id*. § 2, 1 Stat. 272.

As these acts make clear, felons in the founding era not only were permitted to possess firearms, but they were also required to do so. Given this legal obligation, holding that felons lack Second Amendment rights would be textually and historically untenable. *See McCraw*, 2022 WL 3656996, at *5 ("It would be illogical to enumerate a constitutional right to keep and bear arms to maintain an armed

13

militia if that right did not protect those individuals from whom a militia would be drawn.").

### 4. Recent development in Eighth Circuit case law appears invalid, based on its reliance on a vacated decision. Recent developments in other Circuits call into doubt the Eighth Circuit precedent.

The Eighth Circuit considered the constitutionality of § 922(g)(1) in light of *Bruen*, finding that it survives scrutiny. *See United States v. Jackson*, 69 F.4th 495, 501 – 506 (8th Cir. 2023). Reh'g en banc denied, 2023 U.S. App. LEXIS 22991 (8th Cir. 2023). However, the analysis in *Jackson* is largely based on the Third Circuit's then-vacated decision in *Range v. Att'y Gen.*, 53 F.4th 262, 269 (3d Cir. 2022) (per curiam), vacated, reh'g en banc granted, 56 F.4th 992 (3d Cir. 2023). In particular, the Eighth Circuit adopted the "historical record" presented by the vacated panel decision in Range. *Jackson*, 69 F.4th at 503-504. That historical record, however, was not confirmed or adopted the subsequent en banc decision of the Third Circuit.

*Jackson's* rationale and historical justification is completely undermined by the en banc decision entered by the Third Circuit in the subsequent *Range* decision, which does not apply the same historical analysis as the vacated panel opinion, further finding § 922(g)(1) unconstitutional, as applied to the defendant. *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023). The *Range* court, after significant historical review, summarizes:

> For the reasons stated, we hold that the Government has not shown that the Nation's historical tradition of firearms regulation supports depriving *Range* of his Second Amendment right to possess a firearm. *See Bruen*, 142 S. Ct. at 2126.

*Range*, 69 F.4th at 106.

In effect, *Jackson* relies on the vacated rationale of the Third Circuit, which became the dissenting opinions in the ultimate *Range* decision. *See Range*, 69 F.4th at 113 – 143 (Shwartz, J., dissenting) (Krause, J. dissenting), (Roth, J., dissenting). Notably, these dissents reference back to *Jackson* as a basis for their analysis, creating a circuitous justification and legal analysis.

Here, despite the controlling analysis of *Jackson*, Mr. Simonson contends that its reliance on a vacated decision is no longer valid. The subsequent *Range* decision essentially rejects the rationale set forth in *Jackson*. Just like the Fifth Circuit's decision in *Rahimi* overruled its previous *Emerson* decision, and thus undermines the Eighth Circuit's *Bena* rationale based on *Emerson*, the Third Circuit's en banc decision in *Range* "overrules" the earlier vacated decision, thus undermining the Eighth Circuit's *Jackson* rationale based on the vacated *Range* decision. However, because en banc review has been denied in *Jackson*, it remains the controlling authority here, until the United States Supreme Court rules otherwise.

**5. § 922(g)(1) is facially unconstitutional, as applied to Mr. Simonson.**

Based on the *Range* decision's historical analysis and the legal analysis set forth above, Mr. Simonson asks that this court find that 18 U.S.C. § 922(g)(1) is facially unconstitutional under *Bruen*, or as applied to him.

Here, Mr. Simonson's past felony conviction is not of the class of crimes intended to be included within the felon in possession prohibition of 18 U.S.C. § 922(g)(1). Mr. Simonson has one felony conviction. It is a March 10, 2022 conviction

for "Failure to Appear" in Turner County, South Dakota. He has no other felony convictions. Based on this one felony conviction, for which he served 45 days in custody, there is no indication that Mr. Simonson presents a danger to the community. Under the rationale of *Range*, Mr. Simonson asks this Court find 922(g)(1) is facially unconstitutional as applied to him, given the nature of his sole prior felony conviction. *See Range* 69 F.4th at 103, 106.

The landscape of firearms regulation under the Second Amendment is rapidly changing. After *Rahimi* and *Bruen*, a district court in the Fifth Circuit has found that 18 U.S.C. 922(g)(3), regarding the disarmament of drug users, is also unconstitutional. *United States v. Connelly*, No. EP-22-CR-229(2)-KC, 2023 WL 2806324, at *5 - 12 (W.D. Tex. Apr. 6, 2023). Considered together, the decisions in *Bruen*, *Range*, *Rahimi*, and *Connelly*, stand for the proposition that a restriction on Mr. Simonson's possession of firearms, for being a felon as a result of a 2022 Failure to Appear, is unconstitutional as applied to him. Neither his personal history, nor the nation's history of firearm regulations, supports disarmament under the Second Amendment. His past criminal history does not support permanent disarmament. The government is unable to show "that our Republic has a longstanding history and tradition of depriving people like [Mr. Simonson] of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights." *Range*, 69 F.4th at 106. This conclusion continues to find new support in out-of-Circuit, Federal District Court decisions. *See e.g. United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *21 - 31 (S.D. Miss. June 28, 2023).

16

## CONCLUSION

Felon-disarmament laws are not longstanding—at least not in the sense that *Bruen* would use that term. It appears that no American jurisdiction enacted such a law until the 20th century, and Congress did not pass the federal statute at issue here until 1938. Therefore, Section 922(g)(1) violates the Second Amendment as it was understood at the time of its adoption, under the legal standard established in *Bruen*. Whatever societal benefit might be perceived by the permanent disarmament of felons, that concern must yield to the command of the Constitution.

The Court should dismiss the 18 U.S.C. 922(g)(1) allegation as unconstitutional, either facially, or as applied to Mr. Simonson.

Dated this 22nd day of September 2023.

Respectfully submitted,

JASON J. TUPMAN
Federal Public Defender
By:

*/s/ Matthew M. Powers*
Matthew M. Powers, Assistant Federal Defender
Attorney for Defendant
Office of the Federal Public Defender
District of South Dakota
101 Main Avenue, Suite 400
Sioux Falls, SD 57104
Telephone: 605-330-4489 Facsimile: 605-330-4499
Filinguser_SDND@fd.org